UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2012-160 (WOB-JGW)

ST. ELIZABETH MEDICAL CENTER           PLAINTIFF/COUNTER-DEFENDANT

VS.                    MEMORANDUM OPINION AND ORDER

UC HEALTH                              DEFENDANT/COUNTER-CLAIMANT
_____

        This action was filed in federal court invoking diversity
jurisdiction.  St. Elizabeth is a Kentucky citizen while UC Health is
an Ohio citizen and the amount in controversy exceeds $75,000.

        This matter is before the Court on St. Elizabeth's motions for
summary judgment on its Medicaid claim, bond prepaid interest claim,
and a request under FRCP 56(f) for its indemnification claim.  (Doc.
68, Plaintiff's motion for summary judgment on its Medicaid claim;
Doc. 54, Plaintiff's motion for summary judgment on its bond interest
claim; and Doc. 95, Plaintiff's Request for FRCP 56(f) consideration
on its indemnification claim.)  In addition, the matter is before the
Court on UC Health's motions for summary judgment on its Medicaid
claim, and St. Elizabeth's indemnification claim.  (Doc. 66,
Defendant's motion for summary judgment on its breach of contract,
conversion, and unjust enrichment claims relating to the Medicaid
funds; Doc. 64, Defendant's motion for summary judgment on Plaintiff's
indemnification claim.)  In addition, each party has filed a *Daubert*
motion to strike the other party's expert witness.  (Doc. 49,
Plaintiff's motion to strike Defendant's rebuttal expert witness,

Robert Russ; Doc. 80, Defendant's motion to disqualify Plaintiff's expert witness, Troy Dahlberg, and to strike Troy Dahlberg's deposition at Doc. 51).

**Introduction**

**Separation of St. Luke Hospitals (East and West) from UC Health and its transition to St. Elizabeth.**

The Health Alliance (now known as "UC Health") was a consortium of hospitals, including St. Luke Hospitals ("SLH"), and was responsible for the overall management of its member hospitals. (Doc. 30-3. p. 16.) The purpose of these hospitals' coming under the umbrella of one management company was to reduce the cost of providing healthcare. (*Id.*) This new hospital consortium would reduce cost by creating more efficient systems and taking advantage of its new economy of scale. (*Id.*) SLH was a member of the Health Alliance of Greater Cincinnati from 1995 until August 31, 2008. (Doc. 52-1, Financial Settlement Agreement ("FSA"); Doc. 30-3 p. 2, Third Amended and Restated Joint Operating Agreement ("JOA"); Doc. 33-4 p. 1, First Amendment to the Third Amended and Restated Joint Operating Agreement).

On June 6, 2006, SLH intervened in a lawsuit between The Christ Hospital and the Health Alliance in Ohio state court, and the Court permitted SLH to withdraw from the Health Alliance as of the date of intervention. (Doc. 33-3, Ohio State Court Final Judgment). However, this separation was a complex transaction that culminated in a financial settlement agreement on October 27, 2008, which was effective as of August 31, 2008. (Doc. 52-1, FSA).

The parties seem to agree on the general structure of the deal between SLH and the Health Alliance. SLH had a 12.08% interest in the Health Alliance's retained net earnings. (Doc. 30-3 p. 25). St. Elizabeth asserts SLH agreed to give up its 12.08% interest to be a primarily debt-free hospital, where it would be relieved of its obligation as an "Obligated Party" under the Master Trust Indenture to the debt of the Health Alliance. (Doc. 50-3, Agreement Regarding Prepayment of Certain Bond Obligations). The parties agreed that SLH would have a "net book value of the sum of the Assets . . . equal" to $98 million (the "Guaranteed Amount"). (Doc. 52-1 p. 3, Section 1.5(a) of the Financial Settlement Agreement).

The Health Alliance agreed to "transfer, convey, assign, and deliver to SLH, and/or release from the provisions of the JOA" the assets as described in Section 1.1 of the FSA. (Doc. 52-1 p. 2, Section 1.1 of the FSA). The Health Alliance was a management company not a holding company; it did not own the assets of SLH but instead maintained consolidated financial statements of SLH and the other Participating Entities in the Health Alliance. (30-3 Sec. 4.4, 4.5, JOA).

To avoid a lengthy auditing process, the parties agreed to transfer the net book value of the assets back to SLH. That is, instead of inspecting each item and determining a fair market value for each asset, the parties chose to accept the value of each asset on the Health Alliance's financial statements. (Doc. 52-1 p. 8, Section 3.5 of the FSA). Section 3.5 guaranteed the net book values were

accurate. [1]  Combined with Section 1.5, SLH was guaranteed assets that had a net book value of $98 million.  (Doc. 52-1 p. 3-4).

## Conclusions

1.  Are the expert reports admissible?  Yes, the experts satisfy *Daubert* and were timely filed.

2.  Is St. Elizabeth entitled to reimbursement for its payment of the interim bond interest?  Yes, once SLH left the Obligated Group, it no longer had any obligation to pay bond interest.

3.  Is St. Elizabeth entitled to indemnification under the FSA? No, the claim for which St. Elizabeth seeks indemnification was not an indeminifiable claim under Section 10.2(v) of the FSA because it was an assumed liability under Section 1.3 of the FSA.

4.  Is St. Elizabeth entitled to keep the Medicaid settlement funds?  Yes, because the Medicaid Settlement was not an asset subject to the $98 million Guaranteed Amount under Section 1.5 of the FSA.

## 1. *Daubert* Analysis

"Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."  *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997).  However, where there is a need to define terms

---

[1] During oral argument, UC Health's counsel argued for the first time that Section 3.5 only applied to Section 1.1 (a)-(d) and did not include (e).  However, the plain language of Section 1.1 proves this incorrect.  It states that ". . . the following assets, properties, and interests (collectively, the "Assets"):" then lists Section 1.1(a)-(f), all which would "collectively" be the "Assets" as referenced in Section 3.5.  (Doc. 52-1, Sec. 1.1, p. 2, FSA).  While Section 1.1(e) defines the assets described therein as "Other Net Assets," those assets would be a subset of the "Assets" described above.

of art, expert opinion testimony is admissible.  Fed. R. Civ. P. 702.
However, an expert goes too far when interpreting contract language.
*Transpro, Inc. v. Leggett & Platt, Inc.*, 297 F. App'x 434, 441-42 (6th
Cir. 2008) (holding that an accounting expert's testimony that "as of"
is a term of art under GAAP and defining it to give clarity to the
court's contract interpretation was admissible).

Here, Dahlberg provides the Court with an opinion that blends
contract interpretation with definitions and explanations of
accounting terms of art.  Where Dahlberg's expert report strays into
the inadmissible realm of contract interpretation, it is inadmissible.
However, his expert testimony defining accounting terms of art is
admissible.  This analysis applies equally to Dr. Robert Russ's expert
report.

St. Elizabeth also argues that Russ's report should be barred
because he was not properly identified as an expert prior to the
Court's deadlines.  However, as UC Health points out, Russ's report is
a rebuttal report and it met the Court's deadline in that capacity.
As such, Russ's report will not be stricken for failing to meet the
expert report deadline.

## 2. Bond Interest Claim

### *Facts*

When SLH left the Health Alliance, it had no infrastructure in
place to pay expenses, collect its accounts receivable, or maintain
proper financial statements because the Health Alliance had been
responsible for these tasks for the prior fifteen years.  Thus, SLH
and UC Health entered into a Transition Services Agreement ("TSA") in

which UC Health would continue to maintain these administrative functions. (Doc. 33-1 p. 8, TSA).

While UC Health was operating under the Transition Services Agreement to provide these office services, UC Health charged SLH interest as a member of the "Obligated Group" under the Master Trust Indenture ("MTI"). (Doc. 53, MTI). This interest totaled $901,961 from September through December 2008. (Doc. 34-1 ¶ 37 & fn. 49, Dahlberg Expert Report).

UC Health and SLH entered into the "Agreement Regarding Prepayment of Certain Bond Obligations" ("Bond Prepayment Agreement") to facilitate SLH's exit from the Health Alliance. (Doc. 50-3). Under Section 5.3 of the Joint Operating Agreement, the Joint Operating Company ("JOC" or "the Health Alliance") was the only entity that could incur debt on behalf of the Participating Entities, of which SLH was one. (Doc. 30-3, § 5.3). The parties agree that each Participating Entity was also a member of the Obligated Group which was jointly and severally liable for the debts of the Joint Operating Company. (Doc. 72 p. 3, UC Health's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment; Doc. 54-1, p. 3, Plaintiff's Motion for Summary Judgment on the Bond Interest Misallocation Claim).

The parties also agree that the total bond obligation attributable to capital improvements specifically for SLH was $81,220,000. (Doc. 72 p. 3; Doc 54-1 p. 3). This included three bonds: Series 1997C, 1997D, and 2001E. (Doc. 72 p. 3; Doc. 50-3 p. 4). To leave the Health Alliance, SLH either had to assume the

liability for the above-mentioned bonds or prepay them.  UC Health admits SLH chose to prepay the bonds.  (Doc. 72 p. 3).

SLH agreed to give up its 12.08% interest in the retained earnings of the Health Alliance if the Health Alliance prepaid its bond obligations.[2]  To accomplish this, the Health Alliance placed the funds to pay off all of the bonds, interest, and trust fees in trust with Deutsche Bank on August 21, 2008.  (Doc. 42-1, Deutsche Bank escrow records).  The trust then paid interest on these bonds and redeemed them on November 21, 2008 (2001E bond) and December 3, 2008 (1997C and D bonds).  (*Id.*)  The trust was required, under the Master Trust Indenture, to wait ninety (90) days to redeem the bonds to protect the bondholders against a bankruptcy preference should the Health Alliance file for bankruptcy within those 90 days.  The trustee paid the bond interest during the interim period and redeemed the bonds after the preference period ended.  (Doc. 42-1).

St. Elizabeth retained Troy A. Dahlberg as a forensic accounting expert to testify to the accounting terms and accounting requirements relevant to the bond prepayment interest claim (as well as the other claims).  He testified that GAAP does not require interest expense to be an operating expense.  (Doc. 34-1 p. 22, Expert Report of Troy A. Dahlberg).  Further, he notes that the accounting processes that were in place before August 21, 2008 remained in place through December, which would cause SLH to be charged the interest expense on all of the

---

[2] SLH owned 12.08% of the Health Alliances retained net earnings.  The Health Alliance had accumulated net retained earnings of $700,463,000, of which SLH's 12.08% share was $85,332,000.  (Doc. 34-1 Ex. 5, Profit and Loss statement attached to Troy Dahlberg's Expert Report).

bonds as if SLH was still a member of the Obligated Group under the Master Trust Indenture.  (*Id*. at p. 22 ¶ 37).

*Analysis*

**SLH had no obligation to pay for the bond interest after August 21, 2008, when it was released from the Obligated Group.**

This claim is more straightforward than the parties present it. St. Elizabeth argues that UC Health's interest deduction taken from September through December 2008 was improper under the FSA because SLH (Plaintiff) was released from any obligations of the underlying debt. UC Health was acting with authority under the Transition Services Agreement to continue to operate SLH's finances.  The total interim bond interest at issue paid by St. Elizabeth was $901,861.

Under the Financial Settlement Agreement, the culmination of SLH's separation from the Health Alliance, the parties agreed that SLH would be released from the Obligated Group under the Master Trust Indenture.  (Doc. 52-1 Section 7.3).  Section 7 states:

CONDITIONS PRECEDENT TO OBLIGATIONS OF SLH AND SEMC

The obligations of SLH and SEMC hereunder are, at the option of SLH and/or SEMC, subject to the satisfaction, on or prior to the Closing Date, of the following conditions, unless waived in writing by SLH and/or SEMC.

Section 7.3 states:

<u>Release of SLH from Obligated Group</u>.  Pursuant to the terms of the Bond Prepayment Agreement, SLH **shall have been released** from the Health Alliance Obligated Group formed under the Master Trust Indenture (including any and all cross guaranties) and shall have been **released from all liability for all obligations** issued pursuant to the Master Trust Indenture and all other documents establishing bond liability for which SLH may be obligated, except as otherwise expressly set forth in the Bond Prepayment Agreement.

(Doc. 52-1, FSA)(emphasis added).

Under basic rules of contract interpretation, this section explicitly releases SLH from any bond obligations under the Master Trust Indenture, except where it is otherwise **expressly** set forth in the Bond Prepayment Agreement. The Bond Prepayment Agreement is silent as to interim bond interest. Therefore, neither St. Elizabeth nor SLH were obligated to pay the interim bond interest, at the latest, after August 31, 2008, the effective date of the FSA.

UC Health argues that Section 10 of the Bond Prepayment Agreement reserved the interim bond interest payment issue to be decided by the FSA and that Section 1.3(a) of the FSA resolves this dispute. Section 10 of the Bond Prepayment Agreement states:

> The parties agree that they have entered into this Agreement for their mutual benefit and that nothing in this Agreement shall be determinative of any issue in the SLH Negotiations, the pending appeal in the 2006 Litigation or any proceeding in the 2007 Litigation.

(Doc. 50-3 p. 9).

Section 1.3(a) of the FSA states:

> **Assumed Liabilities.** At the Closing, SLH shall assume full responsibility for and agree to pay, perform and discharge the following (collectively, "the Assumed Liabilities");
> (a) all liabilities or obligations arising under or with respect to the Assets or operations of SLH to the extent that such liabilities or obligations arise or are incurred or are first required to be performed after the close of business on August 31, 2008 (the "Effective Time")

(Doc. 52-1 p. 7).

UC Health argues that because the interim bond interest arose after August 31, 2008, it was an assumed liability of St. Elizabeth. This argument, however, fails to take into consideration Section 7.3 quoted above, which, pursuant to the Bond Prepayment Agreement,

explicitly released SLH from "all liability for all obligations" that established bond liability. The Bond Prepayment Agreement released SLH from the Obligated Group under the Master Trust Indenture as of August 21, 2008. Therefore, the interim bond interest was not a liability or obligation of SLH's that arose or was required to be performed after August 31, 2008, because SLH no longer had liability after August 21, 2008.

UC Health's argument also fails because even if its interpretation is accepted, Section 1.3(a) would be in conflict with Section 7.3. If these provisions are in conflict, then the more specific provision would control. "It is a well-settled rule of construction that when interpreting contracts, the definite and precise prevails over the indefinite." *FS Investments, Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002) (citing *Int'l Union of Operating Engineers v. J.A. Jones Const. Co.,* 240 S.W.2d 49 (Ky. 1951)). Because FSA Section 7.3 is specific about its release of liability, it would prevail, if in conflict, with Section 1.3(a), which is a general clause.

Both parties also cite the deposition testimony of the Health Alliance's various CFOs and controllers during the time the contracts were being negotiated. However, that is inadmissible parol evidence because the FSA is not ambiguous. *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322 (Ky. Ct. App. 2009) ("Under the parol evidence rule, when parties reduce their agreement to a clear, unambiguous, and duly executed writing, all prior negotiations, understandings, and agreements merge into the instrument, and a contract as written cannot

be modified or changed by prior parol evidence, except in certain circumstances such as fraud or mistake.").

Thus, the Bond Prepayment Agreement released SLH from the Obligated Group under the requirements of the Master Trust Indenture, and SLH had no outstanding bond obligations for the 1997C, 1997D, and 2001E bonds after August 21, 2008. In addition, even if Section 1.3(a) and Section 7.3 were in conflict, Section 7.3 would control and SLH would have no liability for the interim bond interest. Therefore, any charges to SLH for bond interest were in error.

### 3. Indemnity Claim

#### *Facts*

The indemnification claim arises from activity that began in 2005 and continued until December 2008. (Doc. 59 p. 239, OIG Self Disclosure).[3] SLH had a relationship with Dr. John Edwards who provided vascular outreach services and also served as Medical Director for the SLH Vascular Institute. (*Id*. at p. 242). Dr. Edwards provided physician services at five clinics in Ohio and Kentucky, while SLH provided the technical resources, such as nurses, equipment, and exam rooms. (*Id*.) SLH billed Medicaid and Medicare for the services as "provider based" to SLH West. (*Id*.) However, some of the clinics were operating more than thirty-five miles from SLH West, which was the limit for a "provider based" designation. (*Id*.) SLH was concerned that this arrangement violated 42 C.F.R. § 413.65. (*Id*.) Further, Dr. Edwards was provided medical and office

---

[3] The page citations here are to the pages designated by the Court's electronic filing system.

supplies without paying fair-market value and Dr. Edwards referred patients to SLH. (*Id.*) SLH was concerned this violated Stark laws (self-referral) and the anti-kickback statute. (*Id.*; 42 U.S.C. 1395nn (Stark); 42 U.S.C. 1320(a)-7b (anti-kickback statute).

On January 23, 2009, St. Elizabeth submitted a "Voluntary Self-disclosure" to the Office of Inspector General ("OIG") with the above information. (Doc. 59 p. 239, OIG Self Disclosure). St. Elizabeth's goal was to be accepted into the OIG self-reporting program which would prevent False Claims Act claims from being filed against it and allow St. Elizabeth the ability to negotiate a settlement of these possible violations. A settlement with the OIG was eventually reached for $1.2 million in November 2010. (Doc. 59 p. 122, Deposition of Dennis Kennedy, outside counsel involved in the OIG disclosure; Doc. 1 ¶ 59, Complaint). The self-disclosure refers to the incidents as "potential violations of law" and the OIG settlement specifically states that the "Agreement is neither an admission of liability by [St. Elizabeth] nor a concession by the OIG that its claims are not well-founded." (Doc. 59 p. 239, OIG Self Disclosure; Doc. 59 p. 466, OIG Settlement Agreement).

It appears SLH leadership was aware of these possible violations before the FSA was signed. Steve Eisenberg, counsel for the Health Alliance, made recommendations to correct the compliance issues in an email on September 27, 2006. (Doc. 44-5, Steve Eisenberg email to David Bailey and Kathy Cook). Kathy Cook testified that by the end of 2006 she would have notified Nancy Kremer, the CEO of SLH and an

employee of the Health Alliance, of the possible violations.  (Doc. 44
p. 46–48).

*Analysis*

**St. Elizabeth is not entitled to indemnification for its
settlement with the OIG even if the settlement covered activity
that occurred prior to August 31, 2008 because it was an assumed
liability.**

The FSA answers the question of whether UC Health agreed to
indemnify St. Elizabeth with unambiguous language.  St. Elizabeth is
requesting indemnification for an underlying claim which may have
arisen beginning in 2006.  The Health Alliance gave Dr. Edwards
hospital space, supplies, and staff without charge, while accepting
Medicare referrals from him.  This arrangement may have violated Stark
laws.  42 U.S.C. 1395nn.  St. Elizabeth argues that the Health
Alliance's Senior Management knew of these compliance issues in 2006.

Section 10.2(v) of the FSA states:

**Indemnification by the Health Alliance**.  Subject to the
limitations set forth in § 10.4 below, from and after the
Closing Date, the Health Alliance shall indemnify and hold
harmless SLH and SEMC, and their respective members,
trustees, officers, employees, and representatives, from
and against any and all losses, liabilities, damages,
demands, claims, suits, actions, judgments, or causes of
action, assessments, costs and expenses, including without
limitation, interest, penalties, reasonable attorneys'
fees, any and all reasonable expenses incurred in
investigating, preparing, or defending against any
litigation, commenced or threatened, or any claim
whatsoever, and any and all amounts paid in settlement of
any claim or litigation (collectively "Damages"), assigned
against, resulting to, imposed upon, or incurred or
suffered by SLH and/or SEMC directly as a result of or
arising from . . . (v) any liability known to senior
management of the Health Alliance (**other than the
liabilities assumed hereunder or pursuant to the provisions
hereof** (including, without limitation, the documents
attached as Exhibits hereto)) arising from the operations
of SLH prior to the Effective Time (collectively,
"Indemnifiable Claims").

(Doc. 52-1 pp. 14-15) (emphasis added).

Section 1.3(b) of the FSA states:

**Assumed Liabilities**. At Closing, SLH shall assume full
responsibility for and agree to pay, perform and discharge
the following (collectively, the "Assumed Liabilities"):
(b) all liabilities or obligations arising under or
with respect to the Assets or operations of SLH **prior to or
as of the Effective Time** to the extent the liabilities are
**first required to be paid**, or the obligations are first
required to be performed, **after the Effective Time**, unless
otherwise assumed or transferred under this Agreement . . .
."

(Doc. 52-1 p. 3) (emphasis added).

The FSA's unambiguous contract language bars the underlying claim

from being an Indemnifiable Claim because it is an Assumed Liability.

That is, the liability arose from the operations of SLH **prior to** the

Effective Time and the liability was **first required to be paid after**

the Effective Time. Thus, the liability was an Assumed Liability.

St. Elizabeth's argument that the underlying claims were first

required to be paid in 2006, sixty days after the violations occurred

pursuant to Stark regulation 42 C.F.R. §411.353(d), is not persuasive.

St. Elizabeth's argument fails because it assumes that violations of

the Stark law occurred that required repayment by SLH while SLH was a

member of the Health Alliance. However, no violations have **ever** been

found to have occurred. St. Elizabeth's self-disclosure letter refers

to the underlying claims as "potential violations" and St. Elizabeth's

settlement with the OIG expressly disclaims any admission of liability

by St. Elizabeth. (Doc. 59 p. 242, OIG Self Disclosure; Doc. 59 p.

467 ¶ 7, OIG Settlement Agreement).

It is disingenuous for St. Elizabeth now to come into this Court and argue these were definite violations where liability unquestionably existed.  Before St. Elizabeth settled the potential violations, it never admitted any violations ever occurred.  It is only now that these potential violations are settled that St. Elizabeth affirmatively asserts that the claims were definite violations.

Because the liability at issue was not "required to be paid" until St. Elizabeth settled with the OIG in November 2010, this was an Assumed Liability under Section 1.3(b) of the FSA.  Therefore, it could not be an Indemnifiable Claim because Assumed Liabilities are expressly exempted from being Indemnifiable Claims under Section 10.2(v) of the FSA.

### 4. Medicaid Claim

#### *Facts*

This claim also arises out of the FSA and SLH's separation from the Health Alliance.  UC Health claims it is entitled to a $10.8 million Medicaid settlement fund that St. Elizabeth was paid by Kentucky, with payments beginning in April 2009.  The Joint Operating Company controlled the books of each Participating Entity and collected all revenues and paid all the bills of each Participating Entity.  (Doc. 30-2 § 5.1, JOA).  As discussed above, SLH was granted permission to leave the Health Alliance in an Ohio State Court action, which started negotiations that were finalized with the FSA.

The FSA states that the Health Alliance would "transfer, convey, assign, deliver to SLH and/or release from the provisions of the JOA

and SLH shall acquire from the Health Alliance" certain assets
specified in FSA § 1.1.  (Doc. 52-1, FSA).  Section 1.1(a) – (d)
included property, plant, and equipment, two non-profit entities, and
cash bank accounts, which had a combined net book value of around $84
million.  (*Id*. at § 1.1(a)-(d) and 1.5(a)).  UC Health argues that
Section 1.1(e) is applicable because it included the Medicaid claims.
Section 1.1(e) states that ". . . and certain other net assets . . .
all as more particularly set forth on Schedule 1.1(e) . . . ."

　　　The Health Alliance added a $1 placeholder onto Schedule 1.1(e)
under "Nonpatient Accounts Receivables" that indicated it was for the
Medicaid claims. (Doc 30 pp. 36-37).

　　　The Medicaid claims arise from a settlement that SLH and St.
Elizabeth (along with all Kentucky hospitals) made with the Kentucky
Department of Medicaid Services which required the federal
government's approval.  42 U.S.C. 1396a(b).  The settlement required
SLH to dismiss claims that arose while SLH was still part of the
Health Alliance.  The Kentucky Cabinet for Health and Family Services
(the "Cabinet") oversees the Medicaid program.  (Doc. 68-1 p. 3).  The
SLH claims arose from the Cabinet's change in the way it reimbursed
hospitals beginning in 2003.  (Doc. 47 p. 22, Deposition of Stephen
Price).  This change in methodology allegedly created underpayments to
the hospitals.  (*Id*. at p. 22-26). The underpayments resulted in the
Health Alliance pursuing SLH's claims for underpayment.

　　　The Medicaid settlement agreement stated that payments "shall be
counted toward the Hospital's overall cost coverage for inpatient
hospital services **during the year in which the payment is made**."

(Doc. 47-30 ¶ 2, Settlement Agreement with Kentucky, emphasis added).
This provision was included because the federal government refused to
contribute funds to settle retroactive claims. (Doc. 47 p. 33,
Stephen Price's Deposition, Attorney for SLH in Medicaid Settlement).

In addition, the Medicaid settlement agreement required SLH to
dismiss with prejudice all "administrative claims, appeals, or actions
filed in any state or federal court which are related to the 'Released
Claims. . . .'" (Doc. 47-30 ¶ 4). The "Released Claims" are "all
claims involving Medicaid payments for inpatient and outpatient
hospital services including, without limitation, services provided in
the inpatient or outpatient setting, and any claims related to the
methodology, calculation, and adequacy of said Medicaid payments for
any period of time through January 5, 2009." (*Id*. at ¶ 1). Thus,
SLH's previous claims were required to be dismissed in the settlement
with Kentucky.

### *Analysis*

**St. Elizabeth is entitled to retain the Medicaid settlement funds
because the $98 million Guaranteed Amount is limited to the "net
book value" of assets.**

SLH agreed to limit the total assets from its departure from the
Health Alliance to $98 million in Section 1.5 of the FSA. (Doc. 52-1,
Section 1.5, pp. 3-4). This was to facilitate a "net book value"
asset transaction, which would avoid time consuming and costly audits.
SLH was part of the Health Alliance for fifteen years and its books
were consolidated with the Health Alliance's books.

SLH, being a part of the Health Alliance for fifteen years, would
know that the Health Alliance's books were kept in accordance with

Generally Accepted Accounting Principles ("GAAP"). This superimposes a
standard on the FSA for how the financial statements of the Health
Alliance were maintained.  Further, the Health Alliance was required
to keep its books in accordance with GAAP under Section 6.1 of the
Joint Operating Agreement and according to Jerome Keller, its interim
CFO from 2006 to 2008.  (Doc. 30 p. 54; Doc. 30-3 Section 6.1).[4]

Section 1.1(e) of the FSA included ". . . certain other assets
(collectively the "Other Net Assets"), all as more particularly set
forth on Schedule 1.1(e) . . . ." (Doc. 52-1 p. 2).[5]  Schedule 1.1(e)
includes an account titled "Nonpatient Accounts Receivable" and lists
"411,847" as the balance.  Within this account was the $1.00 Medicaid
claim journal entry.  The Medicaid claim was included on Schedule
1.1(e), which is undisputed by the parties.

---

[4] UC Health's argument that the Amendment to the Joint Operating
Agreement made GAAP inapplicable is not persuasive.  (Doc. 33-4 p. 1
Section 1).  Section 3.5 of the FSA is a warranty that UC Health's
financial statements are accurate.  UC Health was required to keep its
books in accordance with GAAP.  Applying GAAP is not a right,
responsibility, liability or other term of termination.  It is a way
to define accounting terms of art and is not inconsistent with Section
1 of the Amendment to the Joint Operating Agreement.

[5] Section 1.1(e) states in pertinent part: "all right, title and
interest of the Health Alliance in and to certain other assets, net of
related assumed liabilities, including accounts receivable, inventory,
supplies, prepaid assets and certain other assets (collectively the
"Other Net Assets"), all as more particularly set forth on Schedule
1.1(e) hereto; provided that to the extent, and subject to the
limitations, set forth in the Transition Services Agreement (as
defined in Section 1.7 hereof), the Health Alliance will collect, on
SLH's behalf, the liability portion of certain Other Net Assets;
provided further, that at or prior to the Closing, SLH shall assume
full responsibility for the Turfway Professional Center bonds, and SLH
and SEMC shall indemnify the Health Alliance from and against any and
all liabilities relating to such guaranties in accordance with Section
10.3 hereof . . . ."

Section 1.5 of the FSA states: "The Health Alliance hereby guarantees that the August 31, 2008 net book value of the sum of the Assets described in clauses (a), (b), (c), and (d) of Section 1.1, plus the actual collections of the Other Net Assets, will equal $98,000,000 (the "Guaranteed Amount"), which Guaranteed Amount shall be subject to adjustment . . . ." (*Id*. at p. 3). Section 1.5(b) states that "SLH shall pay the Health Alliance, or the Health Alliance shall be entitled to retain, the amount of any excess above the Guaranteed Amount . . . ." (*Id.*)

The $1.00 journal entry is found on Schedule 1.1(e), but it is not part of the Section 1.5 Guaranteed Amount because it does not represent a "net book value" as required in Section 1.5.

Section 1.5 states the Guaranteed Amount is $98 million and "it being agreed that all assets and liabilities will be valued at **net book value** on August 31, 2008 **for all purposes** related to determination of the Guaranteed Amount." (emphasis added). The FSA does not define the term "net book value." However, as discussed above, the Joint Operating Agreement required that the Health Alliance's book be kept in accordance with GAAP, and as an accounting term of art, the Court can look to an accounting expert.

The question before the Court, if the FSA only guaranteed the $98 million valued at "net book value," is whether the $1 journal entry representing the Medicaid claims was a bookable asset. Dahlberg testified that the $1 journal entry was a "gain contingency" and was not a "bookable asset." (Doc. 34-1 ¶¶ 22, 24). UC Health's CFO, Rick Hinds, agrees that the Medicaid claims were a gain contingency and

were not a bookable asset until April 2009. (Doc. 33 pp. 28-29).
Also, as stated above, Keller testified that the $1 journal entry was
a "placeholder" and that it was not a bookable asset because the
Medicaid settlement's value was not reasonably estimable. (Doc. 30 p.
55). The $1 journal entry was not a bookable asset, it was a gain
contingency, and as such it could not represent an "asset at . . .
net book value." As such, it was not part of the $98 million
Guaranteed Amount from Section 1.5 because the $98 million is limited
to the "net book value . . . for all purposes related to the
determination of the Guaranteed Amount." Therefore, the $98 million
Guaranteed Amount of Section 1.5 of the FSA does not include the
Medicaid claims.

The accounts receivable, included in Section 1.1(e)'s Other Net
Assets, are a part of the Section 1.5 $98 million Guaranteed Amount.
However, the accounts receivable are in stark contrast to the $1
journal entry. The accounts receivable were estimable, they were
placed on Schedule 1.1(e), and they had a proper net book value
attached.

Further, Section 1.5(b) provides a procedure for what would
happen if more or less money was collected than what was estimated.
The procedure was in place to provide the parties with their bargained
for exchange because these accounts receivable were recognized to be
an estimate. However, the $1 placeholder shares none of these
qualities. It was not an estimated value of the claims it
represented, it was not bargained for between the parties, and it was
not a sum certain due by a creditor. These differences explain why

the $1 journal entry would be treated differently under Section 1.5 than the other "Other Net Assets."

While the $1 journal entry is not included in the Guaranteed Amount because it is not a "net book value," it is still part of Section 1.1(e). The Medicaid claims are part of Section 1.1(e) because Section 1.1(e) does not limit its included Assets to "net book value" Assets like Section 1.5 does. In addition, the Medicaid claims can be found on Schedule 1.1(e). As such, the Medicaid claims are still an Asset that was transferred under Section 1.1 to SLH, but the Medicaid claims are not part of Section 1.5's Guaranteed Amount. Thus, the Medicaid settlement funds are an asset of St. Elizabeth.[6]

Therefore, having heard oral argument on this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED:**

(1) that St. Elizabeth's motion to strike expert report (Doc. 49) and UC Health's motion to strike deposition and disqualify Troy A. Dahlberg (Doc. 80) are **GRANTED IN PART** and **DENIED IN PART** in accordance with the discussion above;

(2) that St. Elizabeth's motion for summary judgment on its bond interest misallocation claim (Doc. 54) is **GRANTED**;

---

[6] Because the contract explicitly provides for who owns or is entitled to the Medicaid funds, UC Health's conversion and unjust enrichment claims will not lie. *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198, 1206 (W.D. Ky. 1995) ("Nevertheless, the doctrine of unjust enrichment has no application in a situation where there has been an explicit contract which has been performed."); *see also* Lakeshore *Eng'g v. Richmond Utilities Bd.*, No. 12-cv-121, 2013 WL 1314192, at *5 (E.D. Ky. Mar. 27, 2013).

(3) that UC Health's motion on Plaintiff's indemnification claim (Doc. 64) is **GRANTED;**

(4) that St. Elizabeth's motion for summary judgment on the Medicaid claim (Doc. 68) is **GRANTED** and UC Health's motion for summary judgment on the Medicaid claim (Doc. 66) is **DENIED;**

(5) that St. Elizabeth's motion for leave to submit findings of fact and conclusions of law (Doc. 107) is **DENIED;**

(6) that UC Health's motion to strike (Doc. 108) is **DENIED AS MOOT;**

(7) that the parties shall file a Proposed Agreed Judgment within **TEN (10)** days of the date of this Memorandum Opinion and Order, it shall be in accordance with the above analysis, so that each party's right to appeal shall be preserved; and

(8) each party shall bear its own costs.


This 30th day of July, 2014.




Signed By:
*William O. Bertelsman* WOB
United States District Judge